1
2
3
4
5
6
7
8
9            **IN THE UNITED STATES DISTRICT COURT**
10          **FOR THE EASTERN DISTRICT OF CALIFORNIA**
11
12
CLARENCE REITH PATTERSON, JR.,          CASE NO. CV F 10-2084 LJO BAM
13
            Plaintiff,                  **SUMMARY JUDGMENT DECISION**
14      vs.                             (Doc. 30.)
15 MORGAN STANLEY SMITH
BARNEY,
16
            Defendant.
17
_____/
18
19                            __INTRODUCTION__

20      Defendant Morgan Stanley Smith Barney ("MSSB")[1] seeks summary judgment in the absence

21 of sufficient evidence to support plaintiff Clarence Reith Patterson, Jr.'s ("Mr. Patterson's") age

22 discrimination claim and that MSSB's grounds to terminate Mr. Patterson were a pretext for age

23 discrimination. MSSB further seeks summary judgment given the lack sufficient evidence of malice or

24 oppression and managing agent ratification of such conduct to support Mr. Patterson's punitive damages

25 claim.  Mr. Patterson responds that he survives summary judgment in that he satisfactorily performed

26 financial advisor work and that evidence establishes MSSB's age discriminatory animus to terminate

27  _____

28          [1]      This Court generally will refer to Morgan Stanley Smith Barney and predecessor Morgan Stanley as
"MSSB."

                                        1

1  him.  This Court considered MSSB's summary judgment motion on the record[2] and VACATES the

2  February 28, 2012 hearing, pursuant to Local Rule 230(g).  For the reasons discussed below, this Court

3  GRANTS MSSB summary judgment.

## BACKGROUND

### Summary

6  Shortly prior to his termination at age 64, Mr. Patterson was a relationship manager in the MSSB

7  Fresno office with his sons.  After Mr. Patterson's sons left MSSB, MSSB contends that it lacked a

8  position for which Mr. Patterson was qualified.  Mr. Patterson elected to be terminated rather than retire.

9  Mr. Patterson pursues an age discrimination claim under FEHA[3] and claims that he was denied wrongly

10 to apply for a new position for which he was qualified.  MSSB seeks summary judgment in that Mr.

11 Patterson was unqualified for the new position to serve as a legitimate business reason, among others,

12 for his termination.

### Joint Production Team

14 In 1979, Shearson Hayden Stone, Inc. ("Shearson") hired Mr. Patterson as a financial consultant

15 in its Fresno branch and later became MSSB.  For five to six years during the mid-1980s to the late

16 1980s or early 1990s, Mr. Patterson served in the Fresno branch as an administrative manager or

17 assistant branch manager in addition to his role as a financial consultant (later called financial advisor).

18 Mr. Patterson ceased holding a MSSB management position in the 1990s.

19 In January 2002, Mr. Patterson's son Brian Patterson ("Brian") joined MSSB.  Mr. Patterson and

20 Brian entered into a team arrangement by which as MSSB financial advisors, they combined their books

21 of business and split commissions.

22 In January 2004, Mr. Patterson's other son Kevin Patterson ("Kevin") joined MSSB.  About two

23 _____

24     [2]    This Court carefully reviewed and considered the record, including all evidence, arguments, points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed

25 by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the evidence, argument, document, objection or paper.  This Court thoroughly reviewed,

26 considered and applied the evidence it deemed admissible, material and appropriate for summary judgment.  This Court does not rule on evidentiary matters in a summary judgment context, unless otherwise noted.

27

28     [3]    FEHA is the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code, §§ 12900, et seq.

years later, Kevin enter into an arrangement with Mr. Patterson and Brian's team as a financial advisor.[4] From that time to March 2009, Mr. Patterson, Brian and Kevin had a combined book of business as a team of financial advisors and split commissions. Mr. Patterson refers to his arrangement with Brian and Kevin as a "partnership."

MSSB attributes Mr. Patterson to have received the largest percentage share of commissions during the initial stages of the Patterson team. In his deposition, Kevin testified that "we were joined under a team number, the commissions got paid to the team, and then whatever percentages were associated with that team number . . . would get paid out to each person. Because depending on your length of service and things, the amount of commission you did depended how much you took home."

Kevin characterizes Mr. Patterson's duties as "basically service, calls." Mr. Patterson anticipated to continue to work several more years until age 66 or 67.

### Mr. Patterson's Change In Work Arrangements

Starting in 2005, Mr. Patterson took time off from work to care for his wife who died of cancer in September 2008. Mr. Patterson decreased his office hours to about 20 hours a week, two or three days a week, worked from home, and focused on phone calls and client relationships. Mr. Patterson started to receive less of the Patterson team's revenues. During the year prior to his wife's death, Mr. Patterson, by his estimation, spent two half-days per week in the office. Kevin characterizes Mr. Patterson's duties during that time as to "glad hand the clients" and to "maintain" existing client relationships, not to attract new clients although Mr. Patterson attracted a "large" client.

Brian and Kevin expressed their desire to Mr. Patterson to contribute more effort to the Patterson team. Nonetheless, Kevin acknowledged: "It wasn't a necessity for him to have to be there five days a week eight hours a day."

According to then MSSB Fresno Branch Manager Jeff Branch ("Mr. Branch"),[5] Brian and Kevin were concerned and frustrated about Mr. Patterson's work ethic, including limited office time and failure to make telephone calls. In his declaration, Mr. Branch states:

---

[4] This Court will refer to the team arrangement among Mr. Patterson, Brian and Kevin as the "Patterson team."

[5] Mr. Branch is the current MSSB complex manager for the complex including the Fresno branch.

1

2       Since around 2007 and continuing throughout their employment, his sons Brian and
        Kevin Patterson complained to me many times about how they felt that Skip Patterson[6]
        was not coming into the office enough, was not productive and did not timely complete
3       the client calls that they requested of him, and was not performing enough work as part
        of their team.  Based on my observations and the information I received from his sons,
4       I came to the conclusion that Skip Patterson was working minimal hours and was only
        minimally productive, at best.

5       After his wife died, Mr. Patterson returned to the office 2½ days per week and also worked at

6  home.

7                                    **Retirement Discussions**

8       Mr. Patterson discussed with Brian that Mr. Patterson anticipated retiring at age 66 or 67.  In his

9  deposition, Mr. Patterson testified: "I was always talking about retirement, you know, that when you get

10 my years of service and my age you're always talking about it."  Mr. Patterson identified his "ultimate

11 goal . . . was to go to 66, 67."  Mr. Patterson confirmed that he frequently discussed retirement when at

12 the Fresno branch.  As to Mr. Patterson's retirement, Mr. Branch declared:

13              Since around 2007, Skip Patterson initiated many conversations with me about
                his impending plan to retire.  For example, Skip Patterson told me several times that he
14              planned to retire as soon as he received a payment from Citigroup (referred to as the
                "Shearson one-time payment"), which was scheduled to be paid in about 2009.
15

16 When asked about the Shearson one-time payment in his deposition, Mr. Patterson denied that he

17 contemplated retirement on receipt of the payment and reiterated "I desired to stay . . . in my

18 employment until 66 or 67."

19                                **Change To Support Position**

20      During late 2008 and early 2009, Mr. Patterson considered changing to a position to support

21 Brian and Kevin.  MSSB notes that in March 2009, Mr. Patterson accepted a "relationship manager"

22 position to support Brian and Kevin's continuing financial advisor team, which was to pay Mr. Patterson

23 $37,500 annually from the team's revenues. Mr. Branch approved Mr. Patterson's change to relationship

24 manager in March 2009.  After Mr. Branch changed to a relationship manager, he worked two or so days

25 a week in the office and notes that his duties "were to continue approximately the same."  MSSB

26 attributes Mr. Patterson to have continued to discuss retirement after his change to relationship manager.

27

28          [6]        Mr. Branch refers to Mr. Patterson as "Skip."

                                              4

Mr. Patterson claims that he was unfamiliar with the term "relationship manager."  Mr. Patterson testified that his understanding was "that while I was on this, it wasn't a permanent thing, did not have to be a permanent thing; that I would be paid by the firm so much a month" but no incentive compensation.  According to Mr. Patterson, Mr. Branch explained that putting Mr. Patterson on a financial advisor paid status would result in Brian's and Kevin's splitting commissions as the "producers" at a higher commission percentage.  Brian testified that "we did this so that the production would go to Kevin and I [sic], and the amount of money that we would make extra from his production would go to offset the pay decrease that we were going to take."  Brian added that Mr. Patterson's job duties were not to change and the arrangement was "to capture more revenue . . . where we kept more of what we made and less went to the company" based on a MSSB commission schedule paying less (35 percent to 20 percent) to more experienced financial advisors.  Mr. Patterson claims his duties remained unchanged with the new financial arrangement with Brian and Kevin.

Mr. Branch testified that the new financial arrangement addressed MSSB's "grid payout" whereby more experienced financial advisors need higher revenue volumes to maintain the compensation levels of less experienced financial advisors.  Mr. Branch also offered Mr. Patterson the option of a "consulting group analyst," which analyzes "different portfolio managers who may be appropriate for their clients."  According to Mr. Branch, Brian and Kevin preferred the relationship manager option for Mr. Patterson although the consulting group analyst option would likewise accomplish the goal to make Mr. Patterson "100 percent" financial advisor paid.

**Brian And Kevin's Departure From MSSB**

Effective July 24, 2009, Brian and Kevin resigned from MSSB to work for another brokerage firm which MSSB characterizes as a competitor.  Mr. Patterson did not join Brian and Kevin at their new firm.  Kevin testified that he assumed that Mr. Patterson was considered a financial advisor who would manage Kevin and Brian's accounts remaining at MSSB and could "make a decent living off these accounts."  Kevin further testified that "it was our understanding, all three of us, that he was still an F.A. [financial advisor]" because "we didn't know he wasn't an F.A.  That was never really explained to us."

After Brian and Kevin left MSSB, their accounts were divided among Fresno MSSB branch financial advisors through an automated account distribution system to attempt to convince clients to

1  remain with MSSB.  Only financial advisors were eligible to participate in account distribution.  Mr.

2  Patterson was ineligible for distribution of Brian's and Kevin's accounts because he was not a financial

3  advisor and no accounts were distributed to him.

4       The next business day following Brian and Kevin's departure, Mr. Patterson came to the office

5  "to get my accounts and get back to work," however, he was told "to go home."  In his deposition, Mr.

6  Patterson acknowledged he was not a financial advisor but expected "that I would automatically become

7  one again once they left."  Mr. Patterson attributes Mr. Branch to create the impression that "at my time

8  of my choosing I could go back" to a financial advisor.  Mr. Patterson acknowledged that his relationship

9  manager position ceased with Brian and Kevin's departure from MSSB.

10       After Brian and Kevin's departure, Mr. Patterson went to the office a few times to offer to help

11  but was told to go home.  Mr. Branch testified that he told Mr. Patterson to go home because there was

12  no position "available."  Mr. Branch further testified there was "[n]o business reason" to return Mr.

13  Patterson to a financial advisor in that Mr. Patterson "left his book to his sons who left the firm."  Mr.

14  Branch testified that he did not expect Mr. Patterson to develop his own book of business because Mr.

15  Patterson's "book of business had departed, plus with the work ethic, I don't think he would be up to

16  the task."[7]  MSSB continued to pay Mr. Patterson's annual salary although, using Mr. Branch's words,

17  "his salary was supposed to come from his former team's revenue."

18       Fresno MSSB branch Assistant Manager Glenn Ota ("Mr. Ota") was involved in hiring financial

19  advisors and testified that Mr. Branch never told him that MSSB was not interested in hiring financial

20  advisors.  During May 2009, Mr. Ota interviewed a registered financial advisor from another firm whom

21  MSSB did not hire.  Since fall 2009, the Fresno MSSB branch has hired two financial advisor associates

22  who were in their 20s and lacked experience.

23       **Mr. Patterson's Termination**

24       During August and September 2009, Mr. Branch had telephone discussions about Mr. Patterson's

25  employment situation with MSSB Regional Manager Michael Struckman ("Mr. Struckman") and Senior

26

27      [7]    Mr. Branch further testified that Mr. Patterson "was considering retirement.  That's why he wasn't working

28  as much.  He had built the book – the legacy was to leave his book to his kids.  That's one reason why we got into this relationship manager issue was potential retirement coming up."

Human Resource Specialist Wendy Warner ("Ms. Warner"). MSSB notes the absence of an opening for

Mr. Patterson.  Mr. Branch declares:

> After Skip Patterson's sons left for a competitor, there was no open position at the branch for Skip Patterson.  His position as Relationship Manager supporting his sons no longer existed, and there were no other FA's [financial advisors] who were in need of a Relationship Manager.  There was no business need for and a hiring freeze on non-FA positions at that time in the Fresno branch.  Nor was there any open position or business need at that time for a Financial Advisor with no book of business.
>
> . . . Because there was no supporting role for Skip Patterson now that his sons Brian and Kevin Patterson left the company, and because there was no open position at the Fresno branch for which Skip Patterson was qualified, Mr. Struckman, Ms. Warner and I decided and agreed to terminate Skip Patterson's employment.

Mr. Branch wanted to offer Mr. Patterson retirement.  At that time, Mr. Patterson was age 64.

Mr. Branch testified: "The discussions were offer to let Skip retire if he chose, it was his choice to retire,

or if he didn't, he would be let go."  Mr. Branch further declared:

> However, I wanted to offer Plaintiff the option to retire if he chose, since he had frequently discussed his retirement and thus might prefer that option.  Mr. Struckman and Ms. Warner agreed that I could offer that option to Skip Patterson.
>
> I spoke with Skip Patterson about his employment situation several times around September 2009.  I told Skip Patterson that his employment would be terminated given that he was no longer supporting an FA team and did not have any work, but that he had the option of retiring instead if he preferred.  Skip Patterson told me that he preferred to be terminated rather than retire.  Therefore, on September 14, 2009, I terminated Skip Patterson's employment.

Mr. Patterson corroborates that Mr. Branch gave him the option to retire or be terminated and

gave Mr. Patterson "a couple of weeks to think it over."  MSSB attributes Mr. Patterson to prefer

termination over retirement so Mr. Patterson could collect unemployment benefits.

### Newly Created Complex Business Development Officer Position

MSSB explains that the June 1, 2009 consolidation of Morgan Stanley and Citigroup's Smith

Barney resulted in redundant management positions to require the newly-formed MSSB's reorganization

and reduction of management, including elimination of assistant branch managers and sales managers.

MSSB notes that it created a complex business development officer ("CBDO") position to oversee and

drive revenue and asset growth in a "complex" comprising several branches.  The CBDO position is

non-producing, that is, generating no commissions.

During around September 2009, MSSB interviewed to fill the CBDO position for Northern

California, including the Fresno branch.  Peggy Wang ("Ms. Wang"), a MSSB regional business development manager, testified that CBDO eligibility required being "currently in one of the similar sales management positions," including branch manager or assistant branch manager, because MSSB "was going through a reorganization and there was duplication of management."

MSSB explains that during fall 2009, 18 eligible candidates were considered for the Northern California CBDO position, that only three of them indicated willingness to work in Fresno, and that the selected candidate, Artin Yesaie ("Mr. Yesaie"), was only one willing to work in a non-producing capacity required of the CBDO position.

Mr. Patterson claims he "was better qualified for this position than any other candidate," but "was not advised about the position and was not given an opportunity to interview."  Mr. Patterson further claims that if offered, he would have accepted the CBDO position.  Mr. Patterson characterizes Mr. Yesaie as "a 'non-producing' Assistant Branch Manager who was substantially younger" with "substantially less experience" than Mr. Patterson.  Mr. Patterson attributes Mr. Yesaie to be in this mid- to late-30s.

In his deposition, Mr. Patterson acknowledged that during September 2009, he did not hold a position of assistant manager, sales manager or complex sales manager and that he last had held a management position in the early 1990s.

Mr. Patterson testified that shortly prior to his termination, Mr. Ota told Mr. Patterson that Mr. Ota "was potentially going to be interviewed" for the CBDO position.  Mr. Ota attributes Ms. Wang to have told him that "they were looking for a non-producing CBDO, but she encouraged all of the assistant managers to apply for the position."  At that time, Mr. Ota was age 59 and served as a financial advisor and assistant manager.  After the consolidation of Morgan Stanley and Citigroup's Smith Barney, Mr. Ota ceased serving as an assistant manager due to the new managerial structure, and Mr. Yesaie as CBDO assumed Mr. Ota's assistant manager duties.  Mr. Ota testified that Ms. Wang did not inform Mr. Ota that only pre-consolidation managers could apply for the CBDO position.  Mr. Ota interviewed for but was not offered the CBDO position.

Ms. Wang estimates that most of the interviewed CBDO candidates were in their 30s and 40s. She identified one interviewed candidate whom they believed was in his 50s to 60s and two other

8

interviewed candidates who appeared in their 50s.

### Mr. Patterson's Relationship With Mr. Branch

In his deposition, Mr. Patterson acknowledged that Mr. Branch "was a good manager" and treated him fairly, except for "acting on orders" to terminate Mr. Patterson.  Mr. Patterson further acknowledged that Mr. Branch lacked ill will based on Mr. Patterson's age, never made derogatory comments regarding Mr. Patterson's age, and never demonstrated ill will based on age.  Mr. Patterson identifies no one in the Fresno branch who treated him unfairly.

### Mr. Patterson's Claims

Mr. Patterson proceeds on a sole FEHA age discrimination claim that he was terminated based on his age in that:

1. Mr. Patterson was qualified for the CBDO position but was not advised of or given an opportunity to interview for it;

2. The CBDO position was given to someone "substantially younger"; and

3. Mr. Patterson was given the option of being fired or "retiring."

Mr. Patterson seeks recovery for lost wages and benefits, emotional distress, and punitive damages.

### DISCUSSION

### Summary Judgment Standards

MSSB argues that it is entitled to summary judgment in the absence of evidence to support a prima facie age discrimination case and to challenge MSSB's legitimate reasons to terminate Mr. Patterson.

F.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  "A district court may dispose of a particular claim or defense by summary judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv.,*

1   *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary

2   judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need

3   for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers*

4   *v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

5       On summary judgment, a court must decide whether there is a "genuine issue as to any material

6   fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(a), (c); *Covey*

7   *v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*,

8   398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82

9   S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.

10  1984).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

11  inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for

12  summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106

13  S.Ct. 2505 (1986).

14      The evidence of the party opposing summary judgment is to be believed and all reasonable

15  inferences that may be drawn from the facts before the court must be drawn in favor of the opposing

16  party.  *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The

17  inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or

18  whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-

19  252, 106 S.Ct. 2505.

20      To carry its burden of production on summary judgment, a moving party "must either produce

21  evidence negating an essential element of the nonmoving party's claim or defense or show that the

22  nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

23  persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

24  Cir. 2000); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (2007) (moving party is able to

25  prevail "by pointing out that there is an absence of evidence to support the nonmoving party's case");

26  *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).  A

27  "complete failure of proof concerning an essential element of the nonmoving party's case necessarily

28  renders all other facts immaterial" to entitle the moving party to summary judgment. *Celotex Corp. v.*

1  *Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

2      "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

3  court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech*

4  *Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.

5  Only disputes over facts that might affect the outcome of the suit under the governing law will properly

6  preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

7      "If a moving party fails to carry its initial burden of production, the nonmoving party has no

8  obligation to produce anything, even if the nonmoving party would have the ultimate burden of

9  persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

10  "If, however, a moving party carries its burden of production, the nonmoving party must produce

11  evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

12  at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

13  fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

14  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry

15  of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

16  make the showing sufficient to establish the existence of an element essential to that party's case, and

17  on which that party will bear the burden of proof at trial.")

18      "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

19  the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

20  106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough

21  'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp.*

22  *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

23  289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the

24  plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

25      As discussed below, Mr. Patterson fails to raise factual issues that he was subject to age

26  discrimination.

27  / / /

28  / / /

11

**Burden Shifting Framework**

For Mr. Patterson's FEHA age discrimination claim, the *McDonnell Douglas*[8] burden-shifting framework applies in the absence of direct evidence of discrimination.  *See Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007).  "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination, based on a theory of disparate treatment."  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 353, 100 Cal.Rptr.2d 352, 378 (2000).  "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."  *Guz*, 24 Cal.4th at 353, 100 Cal.Rptr.2d at 378.

"At the first step of *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination or retaliation."  *Metoyer*, 504 F.3d at 931, n. 6.  "If the plaintiff makes out her prima facie case of either discrimination or retaliation, the burden then 'shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct.'"  *Metoyer*, 504 F.3d at 931, n. 6 (quoting *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003)); *see Scotch v. Art Institute of California-Orange County, Inc.*, 173 Cal.App.4th 986, 1020, 93 Cal.Rptr.3d 338 (2009).

"Finally, at the third step of *McDonnell Douglas*, if the employer articulates a legitimate reason for its action, 'the presumption of discrimination drops out of the picture, and the plaintiff may defeat summary judgment by satisfying the ususal standard of proof required'" under F.R.Civ.P. 56(c)(1). *Metoyer*, 504 F.3d at 931 (quoting *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citations and internal quotation marks omitted)).  "Once an employer satisfies its initial burden of proving the legitimacy of its reason for termination, the discharged employee seeking to avert summary judgment must present specific and substantial responsive evidence that the employer's evidence was in fact insufficient or that there is a triable issue of fact material to the employer's motive." *King v. United Parcel Service, Inc.*, 152 Cal.App.4th 426, 433, 60 Cal.Rptr.3d 359 (2007). If the employer carries its burden, plaintiff must have an opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the employer were not its true reasons but were a pretext for

---

[8]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089 (1981); *McDonnell Douglas*, 411 U.S. at 804; 93 S.Ct. 1817; *see Brundage v. Hahn*, 57 Cal.App. 4th 228, 66 Cal.Rptr.2d 830, 835 (1997).  "If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed." *Washington v. Garrett*, 10 F.3d 1421, 1432-1433 (9th Cir. 1993).

The plaintiff is required to produce "specific, substantial evidence of pretext" to avoid summary judgment.  *Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir. 1995), *cert. denied*, 516 U.S. 1048, 116 S.Ct. 711 (1996).  Neither plaintiff's subjective beliefs nor uncorroborated, self-serving declarations create a genuine issue of fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002);  *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 401 (7th Cir. 1997), *cert. denied*, 523 U.S. 1118, 118 S.Ct. 1795 (1998); *King*, 152 Cal.App.4th at 433, 60 Cal.Rptr.3d 359.  "And finally, plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." *King*, 152 Cal.App.4th at 433-434, 60 Cal.Rptr.3d 359.

Despite the burden shifting, the ultimate burden of proof remains always with the plaintiff to show that the employer intentionally discriminated against plaintiff.  *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1281 (9th Cir. 2000), *cert denied*, 121 S.Ct. 2592 (2001); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420-1421 (9th Cir. 1990), *cert. denied,* 533 U.S. 950, 121 S.Ct. 2592 (2001).

### *Alternative Direct Evidence*

As an alternative to the *McDonnell Douglas* framework, a plaintiff responding to a summary judgment motion "may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citation omitted).  The "*McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613 (1985).

"When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual

1   motivation of the employer is created even if the evidence is not substantial. . . .[I]t need be 'very little.'"

2   *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (quoting *Lindahl v. Air France*, 930

3   F.2d 1434, 1438 (9th Cir 1991)).  "Direct evidence is evidence which, if believed, proves the fact [of

4   discrimination] without inference or presumption."  *Goodwin*, 150 F.3d at 1221 (citation omitted).

5   "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or

6   actions by the employer."  *Coghlan v. American Seafoods Co. LLC.,* 413 F.3d 1090, 1095 (9th Cir. 2005).

7       In the absence of direct evidence, Mr. Patterson relies on the burden shifting analysis.  As such,

8   this Court next turns to MSSB's challenges to a prima case of age discrimination.

9                           **Age Discrimination – Prima Facie Case**

10      FEHA deems unlawful: "For an employer, because of . . . age . . . of any person . . . to discharge

11  the person from employment . . . or to discriminate against the person in compensation or in terms,

12  conditions, or privileges of employment."  Cal. Gov. Code, § 12940(a).  FEHA defines age as "the

13  chronological age of any individual who has reached his or her 40th birthday."  Cal. Gov. Code, §

14  12926(b).

15      A prima facie age discrimination case under California law generally requires that the employee

16  offer circumstantial evidence such that a reasonable inference of age discrimination arises by showing:

17      1.   The employee was age 40 or older;

18      2.   An adverse employment action was taken against the employee;

19      3.   At the time of the adverse action, the employee was satisfactorily performing his/her job

20           or was qualified for the position sought; and

21      4.   The employee was replaced in his position by a significantly younger person, or other

22           circumstances suggesting discriminatory motive.

23  *See Hersant v. Dept. of Social Services*, 57 Cal.App.4th 997, 1003-1004, 67 Cal.Rptr.2d 483, 486

24  (1997); *see also McCaskey v. California State Auto. Assn.*, 189 Cal.App.4th 947, 979, 118 Cal.Rptr.3d

25  34 (2010).

26      The fourth element (replacement by a younger employee) has been treated with flexibility.  The

27  U.S. Supreme Court has gone so far as to note that plaintiff's replacement by someone outside the

28  protected class is not a proper element of the prima facie case.  *O'Connor v. Consolidated Coin Caterers*

1   *Corporation*, 517 U.S. 308, 312, 116 S.Ct. 1307 (1996).  Even the California Supreme Court in *Hersant*,

2   67 Cal.Rptr.2d at 486, n. 1, 57 Cal.App.4th at 1004, n. 1, noted: "It is not entirely clear that this last

3   element is a required part of the employee's prima facie case."

### *Qualified For Position*

5       There is no dispute that Mr. Patterson was more than age 40 at his termination, an adverse action.

6   As such, MSSB challenges that Mr. Patterson was qualified for the CBDO position after his relationship

7   manager position was eliminated.

8       MSSB argues that with Mr. Patterson's acknowledged elimination of his relationship manager

9   position, Mr. Patterson must demonstrate that he was qualified for another open position.  MSSB notes

10  that Mr. Patterson was ineligible for the CBDO position which was open only to then current managerial

11  staff, including assistant branch managers and sales managers, positions which were being eliminated.

12  MSSB contends that its "business judgment" controlled CBDO eligibility requirements.  *See Dale v.*

13  *Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) ("This Court does not sit as a super-personnel

14  department that reexamines an entity's business decisions."); *Mateo-Woodburn v. Fresno Community*

15  *Hospital & Medical Center,* 221 Cal.App.3d 1169, 1184-1185, 270 Cal.Rptr. 894 (1990) ("[a]n

16  important public interest exists in preserving [an employer's] ability to make managerial and policy

17  determinations and to retain control over the general management of the . . . business").  MSSB

18  concludes that given Mr. Patterson's ineligibility to serve as a CBDO and absence of another position

19  for which Mr. Patterson was qualified, "there was no open position at the branch at that time."

20      Mr. Patterson responds that there is no evidence of Mr. Patterson's unsatisfactory job

21  performance in that at his termination, Mr. Patterson was responsible to maintain existing clients, not

22  obtain new clients.  Mr. Patterson challenges criticism of his work hours in that he cared for his dying

23  wife.  Mr. Patterson points to the absence of MSSB contentions that he was terminated because he did

24  not work full time in the office.

25      Mr. Patterson fails to demonstrate that he was qualified for the CBDO position or another

26  available position.  Mr. Patterson fails to challenge that the CBDO position was limited to then

27  managerial employees. Despite his purported unfamiliarity with a "relationship manager," Mr. Patterson

28  acknowledges that he was not a manager when Brian and Kevin left MSSB and had not been a manager

15

1   for years prior to their departure.  Mr. Patterson worked out an arrangement with Brian, Kevin and

2   MSSB to be paid a fixed salary, without commissions, and to work fewer hours at the office.  Mr.

3   Patterson's belief that he could easily return to financial advisor status is unavailing as the evidence

4   reveals his limited role to massage clients, not serve as a manager.  Moreover, Mr. Patterson

5   impermissibly raises for the first time in summary judgment opposition a claim that he could return as

6   a financial advisor.  *See Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1080 (9th Cir. 2008)

7   ("where, as here, the complaint does not include the necessary factual allegations to state a claim, raising

8   such claim in a summary judgment motion is insufficient to present the claim to the district court").  In

9   short, Mr. Patterson was not a manager, was unqualified for the CBDO position, and is unable to pursue

10  a claim based on reversion to financial advisor status.

11                              ***More Favorable Treatment For Others***

12          MSSB notes that as part of a prima facie discrimination case, courts address whether "similarly

13  situated persons outside the protected class were given more favorable treatment."  MSSB points to an

14  absence of evidence that it "treated similarly-situated younger support employees without a team to

15  support . . . differently" or that a younger employee replaced Mr. Patterson as relationship manager given

16  elimination of the position with Brian and Kevin's departure from MSSB.  MSSB explains that Mr.

17  Patterson's then non-management position rendered him not "similarly situated" to eligible CBDO

18  candidates.

19          MSSB is correct.  The focus is on Mr. Patterson's non-managerial position and role at his

20  termination, not a managerial position such as CBDO.  There is no evidence that a younger employee

21  was offered a relationship manager position.  Although MSSB hired financial advisor associates, Mr.

22  Patterson offers no evidence as to their duties and similarity to his.  The record is clear that Mr. Patterson

23  did not hold the status of an entry-level financial advisor associate.  Mr. Patterson raises no factual issues

24  of similar employees treated more favorably than Mr. Patterson.

25                      ***Other Circumstances Suggesting Discriminatory Motive***

26          Mr. Patterson argues that MSSB's focus on his retirement demonstrates age-based animus and

27  that a jury may conclude that Mr. Branch believed that Mr. Patterson had a "short timer's" attitude.

28          There is no evidence that discussions regarding Mr. Patterson's retirement suggest age

                                                    16

1  discrimination.  Despite Mr. Patterson's claim that he desired to work until age 66 or 67, Mr. Patterson

2  acknowledges his retirement discussions.  His reduced duties and acceptance of a salaried position

3  evidence movement toward retirement.  The record reveals only that Mr. Branch accommodated Mr.

4  Patterson, Brian and Kevin in their team arrangement and did not exhibit age-based animus.

5          Mr. Patterson contends that MSSB's commission schedule penalizes employees "with longevity

6  by lowering their commissions based on their seniority."  MSSB responds that its commission schedule

7  is immaterial to Mr. Patterson's age discrimination claim in that financial advisors received commissions

8  based on generated revenue and performance goals and MSSB permissibly expected higher performance

9  by more experienced employees.

10         Mr. Patterson provides no evidence to raise factual issues that MSSB's commission schedule was

11  based on age or discriminatory practices.  "[I]t is incorrect to say that a decision based on years of service

12  is necessarily 'age based.'"  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611, 113 S.Ct. 1701 (1993).

13  MSSB demonstrates that its commission schedule is based on performance commensurate with

14  experience, not age.  Mr. Patterson ignores that he was in a commission-driven profession and was not

15  paid a salary until he requested one.  Mr. Patterson offers nothing to suggest commission discrimination

16  in that the commission schedule was uniform, regardless of age.

17         Mr. Patterson further notes that only a few of the CBDO candidates were older than 50.

18  Evidence that most CBDO candidates were in their 30s and 40s reflects only on the pool of qualified

19  candidates and does raise an inference of age discrimination.  Mr. Patterson offers no competent

20  evidence that the managerial requirement resulted in disproportionately younger CBDO candidates.  The

21  CBDO position was newly created, non-commission paying and limited to Fresno.  Mr. Patterson fails

22  to challenge that Mr. Yesaie was the only qualified candidate willing to take the position in Fresno.

23         In sum, Mr. Patterson fails to establish a prima facie case of discrimination.

24                         **Legitimate, Non-Discriminatory Reason**

25         MSSB argues that it offers legitimate, nondiscriminatory reasons to terminate Mr. Patterson and

26  which were elimination of the relationship manager position with Brian and Kevin's departure and no

27  opening for which Mr. Patterson was qualified.  *See Coleman*, 232 F.3d at 1282 (reduction in force and

28  "lack of proper qualifications" are legitimate, nondiscriminatory reasons).

1       If plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some

2    legitimate, nondiscriminatory reason" for adverse employment action. *McDonnell Douglas Corp.,* 411

3    U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 252-253, 101 S.Ct. 1089; *Coleman,* 232 F.3d at 1281;

4    *Guz,* 24 Cal.4th at 355-356, 100 Cal.Rptr. at 379; *Brundage,* 57 Cal.App.4th at 236, 66 Cal.Rptr.2d at

5    835.  A reason is "'legitimate'" if it is "facially unrelated to prohibited bias, and which if true, would

6    thus preclude a finding of discrimination." *Guz,* 24 Cal.4th at 358, 100 Cal.Rptr.2d 352.

7       "The defendant's burden at this stage is one of production, not persuasion. The court may not

8    make a credibility assessment."  *Njenga v. San Mateo County Superintendent of Schools*, 2010 WL

9    1261493, at *14 (N.D. Cal. 2010) (citing *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

10   142, 120 S.Ct. 2097 (2000)).  "The defendant need not persuade the court that it was actually motivated

11   by the proffered reasons." *Burdine*, 450 U.S. 254, 101 S.Ct. 1089.

12       Mr. Patterson incorrectly argues that MSSB's grounds to terminate Mr. Patterson are unclear.

13   MSSB clearly indicates that it lacked an opening for which Mr. Patterson was qualified.  Mr. Patterson

14   argues that he was qualified as a financial advisor when terminated.  However, Mr. Patterson, as he

15   acknowledges, was not a financial advisor at his termination.  Even if Mr. Patterson were "reinstated"

16   as a financial advisor, Mr. Patterson points to no available financial advisor position for someone of his

17   stature lacking the requisite book of business.  Mr. Patterson's book of business went to Brian and

18   Kevin, and that which they did not take was distributed in the Fresno MSSB office pursuant to MSSB

19   procedures on a day when Mr. Patterson was not in the Fresno MSSB office.  MSSB articulates a

20   legitimate, non-discriminatory reason free of factual questions to terminate Mr. Patterson.

21                           **Pretext**

22       MSSB challenges Mr. Patterson's ability to "provide substantial evidence that MSSB's stated

23   reason for his discharge is false."

24       "If the employer has met its burden by showing a legitimate reason for its conduct, the employee

25   must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons

26   were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a

27   reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other

28   unlawful action." *Cucuzza v. City of Santa Clara,* 104 Cal.App.4th 1031, 1038, 128 Cal.Rptr.2d 660

(2002). "If the defendant offers admissible evidence of a legitimate, nondiscriminatory reason for the claimed adverse action, the *McDonnell Douglas* framework and its presumption of discrimination disappear, and the plaintiff is left to prove by a preponderance of the evidence that the reasons offered by the defendant are merely a pretext for discrimination." *Njenga*, 2010 WL 1261493, at *14 (citing *Reeves*, 530 U.S. 133, 143, 120 S.Ct. 2097 (2000)).

The "critical" issue at the pretext stage is whether the plaintiff produces "sufficient evidence to raise a triable issue of fact as to whether the reason proffered by [employer] for denying her promotion was a pretext for unlawful retaliation or discrimination. *Bergene v. Salt River Project Agr. Imp. and Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001); *see Manatt v. Bank of America, N.A.*, 339 F.3d 792, 801 (9th Cir. 2003) ("Because [plaintiff] failed to introduce any direct or specific and substantial circumstantial evidence of pretext, summary judgment for the [defendant] must be affirmed."); *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (failure to "produce any specific, substantial evidence of pretext" support summary judgment for employer); *Brundage*, 57 Cal.App.4th at 236, 66 Cal.Rptr.2d at 835.

"In response to the defendant's offer of nondiscriminatory reasons, the plaintiff must produce 'specific, substantial evidence of pretext.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (quoting *Steckl*, 703 F.2d at 393). In other words, the plaintiff "must tender a genuine issue of material fact as to pretext in order to avoid summary judgment." *Steckl*, 703 F.2d at 393. A "plaintiff cannot create a genuine issue of pretext to survive a motion for summary judgment by relying solely on unsupported speculations and allegations of discriminatory intent." *Crawford v. MCI Worldcom Communications, Inc.*, 167 F.Supp.2d 1128, 1135 (S.D. Cal. 2001); *see Horn v. Cushman & Wakefield Western, Inc.*, 72 Cal.App.4th 798, 85 Cal.Rptr.2d 459 (1999) ("conflict of evidence . . . not created by speculation or conjecture").

Moreover, legitimate, nondiscriminatory reasons "need not necessarily have been wise or correct" but must be "facially unrelated to prohibited bias." *Guz,* 24 Cal.4th at 358, 100 Cal.Rptr.2d 352 (2000); *see Kariotis v. Navistar Intern. Transp. Corp.,* 131 F.3d 672, 676 (7th Cir. 1997) (proffered reasons, if "nondiscriminatory on their face" and "honestly believed" by employer, will suffice even if "foolish or trivial or baseless").

19

1    MSSB points to the legitimacy of Mr. Patterson's termination given there is no dispute as to

2    elimination of Mr. Patterson's relationship manager position, unavailability of other open positions at

3    the MSSB Fresno branch, and Mr. Patterson's ineligibility for the CBDO position.  MSSB notes the

4    absence of facts to suggest that Mr. Patterson's age was the "real reason" for Mr. Patterson's termination

5    and non-selection for the CBDO position.  MSSB points to Mr. Patterson's deposition testimony that

6    he was neither treated unfairly nor subjected to ill will due to his age.  MSSB challenges existence of

7    evidence that decision makers had an age animus as to his termination or the CBDO selection.

8    MSSB continues that the retirement offer to Mr. Patterson is not evidence of discrimination.  *See*

9    *Ray v. Tucson Old Pueblo Credit Union*, 228 Fed.Appx. 682, 683 (9th Cir. 2007) (inquiry about

10   retirement plans "gives insufficient support to a claim that the Board's reasons for terminating her were

11   pretextual").  MSSB argues that retirement questions to an eligible employee provide no basis to infer

12   age discrimination.  *See Sirridge v. Bar-S Food Company,* 138 Fed.Appx. 948, 949 (9th Cir. 2005) (chief

13   operating officer's comments that he wanted plaintiff to "retire" and that plaintiff was "long in the tooth"

14   provide no inference of age discrimination) *Richards v. City of Seattle*, 32 Fed.Appx. 452, 455 (9th Cir.

15   2002) ("questions about one's retirement posed to an employee who is eligible for retirement, and who

16   is not performing satisfactorily does not provide a reasonable basis for inferring age discrimination");

17   *Ziegler v. Beverly Enterprises-Minnesota, Inc.*, 133 F.3d 671, 676 (8th Cir. 1998) ("We do not think that

18   suggesting retirement to an employee who is eligible for retirement, and who is not performing

19   satisfactorily, provides a reasonable basis for inferring age discrimination."); *Kaniff v. Allstate Ins. Co.,*

20   121 F.3d 258, 263 (7th Cir. 1997) (raising possibility of retirement to spare plaintiff embarrassment of

21   being terminated for dishonesty would not alone give rise to an inference of discrimination).  MSSB

22   concludes that Mr. Patterson's termination arose from "reasons unrelated to his age" and that retirement

23   inquiries were a courtesy.

24   To support pretext, Mr. Patterson reiterates his claims that his retirement date was uncertain and

25   that MSSB objected to his work habits, hired two financial advisor associates in their 20s, and used a

26   discriminatory commission schedule.  Mr. Patterson attributes MSSB to justify his termination on

27   grounds that "he was, in essence, a short-timer waiting for retirement who was not particularly motivated

28   to work."

1    MSSB is correct that Mr. Patterson "fails to provide the necessary substantial and specific
2    evidence of pretext" and "recycles the arguments that he asserts to attempt to make his prima facie case."
3    The inferences from the record reflect no pretext for age discrimination, especially given Mr. Patterson's
4    acknowledgment that his relationship manager position was no longer supported with Brian and Kevin's
5    departure and that he lacked manager qualifications for the CBDO position.  The evidence further
6    reflects that at his termination, Mr. Patterson lacked necessary production and asset qualifications to
7    transition to an unavailable financial advisor position.

8    **Punitive Damages**

9    MSSB argues that Mr. Patterson's punitive damages claims are doomed with failure of his age
10   discrimination claim and to meet the clear and convincing standard for punitive damages.

11   ***Elements And Proof***

12   California Civil Code section 3294 ("section 3294") provides that in an action "for breach of an
13   obligation not arising from contract," a plaintiff may seek punitive damages "where it is proven by clear
14   and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ.
15   Code, § 3294(a).

16   Section 3294(c)(1)–(3) defines:

17   1.    "Malice" as "conduct which is intended by the defendant to cause injury to the plaintiff
18         or despicable conduct which is carried on by the defendant with a willful and conscious
19         disregard of the rights and safety of others";

20   2.    "Oppression" as "despicable conduct that subjects a person to cruel and unjust hardship
21         in conscious disregard of that person's rights"; and

22   3.    "Fraud" as "an intentional misrepresentation, deceit, or concealment of a material fact
23         known to the defendant with the intention on the part of the defendant of thereby
24         depriving a person of property or legal rights or otherwise causing injury."

25   "'Despicable conduct' is conduct which is so vile, base, contemptible, miserable, wretched or loathsome
26   that it would be looked down upon and despised by ordinary decent people." *Mock v. Michigan Millers*
27   *Mutual Ins. Co.*, 4 Cal.App.4th 306, 331, 5 Cal.Rptr.2d 594 (1992).

28   Punitive damages are "available to a party who can plead and prove the facts and circumstances

21

1  set forth in Civil Code section 3294." *Hilliard v. A.H. Robbins Co.*, 148 Cal.App.3d 374, 392, 196

2  Cal.Rptr. 117 (1983).  Punitive damages are never awarded as a matter of right, are disfavored by the

3  law, and should be granted with the greatest of caution and only in the clearest of cases.  *Henderson v.*

4  *Security Pacific National Bank*, 72 Cal.App.3d 764, 771, 140 Cal.Rptr. 388 (1977).

5         The clear and convincing standard of proof applies on summary judgment to punitive damages

6  claims.  *See Anderson*, 477 U.S. at 254-255, 106 S.Ct. 2505; *Stewart v. Truck Ins. Exchange*, 17

7  Cal.App.4th 468, 482, 21 Cal.Rptr.2d 338 (1993).  "'Clear and convincing' evidence requires a finding

8  of high probability." *Mock*, 4 Cal.App.4th at 332, 5 Cal.Rptr.2d 594.  The clear and convincing standard

9  requires evidence "'so clear as to leave no substantial doubt'; 'sufficiently strong to command the

10 unhesitating assent of every reasonable mind.'" *Mock*, 4 Cal.App.4th at 332, 5 Cal.Rptr.2d 594 (citations

11 omitted.)

12        MSSB notes the absence of evidence of its malice or oppression.  MSSB points to Mr.

13 Patterson's acknowledgment that key decision maker Mr. Branch treated Mr. Patterson fairly and

14 demonstrated no ill will based on age.  MSSB characterizes its action as a "routine personnel decision"

15 which arose with elimination of Mr. Patterson's relationship manager position, Mr. Patterson's CBDO

16 ineligibility, and absence of an available position at the Fresno branch.

17        Mr. Patterson broadly contends "there is evidence establishing that there is a triable issue of fact

18 on the claim of age discrimination" given that age discrimination "constitutes intentional malicious and

19 oppressive conduct."  Mr. Patterson relies on MSSB's commission schedule reducing commissions "as

20 they age," Mr. Patterson's client base "taken away from him," and Mr. Branch's assurances that Mr.

21 Patterson could return to financial advisor status.

22        The evidence fails to support Mr. Patterson's age discrimination claim let alone a claim for

23 punitive damages.  Mr. Patterson left his book of business to Brian and Kevin and what remained at

24 MSSB was distributed to eligible financial advisors pursuant to MSSB procedures.  There is no evidence

25 that Mr. Branch assured Mr. Patterson that Mr. Patterson could revert to a financial advisor, especially

26 given Mr. Branch's declaration that Mr. Branch "had no expectation and did not advise Patterson that

27 he could return to a Financial Advisor position at any time of his choosing or if anything happened."

28 The record fails to raise inferences of malice, oppression or fraud to support punitive damages.

### *Managing Agent*

MSSB further attacks Mr. Patterson's punitive damages claim in absence of evidence that an MSSB managing agent acted with oppression, fraud or malice or ratified such conduct by a non-managing agent.

Section 3294(b) addresses requirements to impose punitive damages against employers:

> An employer shall not be liable for [punitive] damages . . . based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud or malice must be on the part of an officer, director, or managing agent of the corporation.

"While an employer may be liable for an employee's tort under the doctrine of respondeat superior, he is not responsible for punitive damages where he neither directed nor ratified the act." *Merlo v. Standard Life & Acc. Ins. Co.*, 59 Cal.App.3d 5, 18, 130 Cal.Rptr. 416 (1976).

Section 3294 requires proof of wrongful conduct among corporate leaders: the "officer[s], director[s], or managing agent[s]." Cal. Civ. Code, § 3294(b); *Cruz v. HomeBase*, 83 Cal.App.4th 160, 166, 99 Cal.Rptr.2d 435 (2000). In *Cruz*, 83 Cal.App.4th at 166-167, 99 Cal.Rptr.2d 435, the California Court of Appeal explained:

> This is the group whose intentions guide corporate conduct. By so confining liability, the statute avoids punishing the corporation for malice of low-level employees which does not reflect the corporate "state of mind" or the intentions of corporate leaders. This assures that punishment is imposed only if the corporation can be fairly viewed as guilty of the evil intent sought to be punished.

"The determination whether employees act in a managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy." *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 822, 169 Cal.Rptr. 691 (1979), *cert. denied*, 445 U.S. 912, 100 S.Ct. 1271 (1980). "Managing agents" are employees who "exercise[] substantial discretionary authority over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal.4th 563, 573, 88 Cal.Rptr.2d 19 (1999). "'[C]orporate policy' is the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations. A 'managing agent' is one with substantial authority over decisions that set these general principles and rules." *Cruz*, 83 Cal.App.4th

1   at 167-168, 99 Cal.Rptr.2d 435.

2        An act of oppression, fraud or malice, by an officer, director or managing agent, is sufficient to

3   impose liability on a corporate employer for punitive damages, without an additional showing of

4   ratification by the employer.  Cal. Civ. Code, § 3294(b); *Agarwal v. Johnson*, 25 Cal.3d 932, 950, 160

5   Cal.Rptr. 141 (1979), *overruled on other grounds*, *White*, 21 Cal.4th 563 at 574, n. 4, 88 Cal.Rptr.2d 19;

6   *Kelly-Zurian v. Wohl Shoe Co., Inc.*, 22 Cal.App.4th 397, 420, 27 Cal.Rptr.2d 457, 469 (1994).  The

7   critical inquiry whether employees act in a managerial capacity is "the degree of discretion the

8   employees possess in making decisions that will ultimately determine corporate policy."  *Egan*, 24

9   Cal.3d at 822-823, 169 Cal.Rptr. 691; *see Kelly-Zurian*, 22 Cal.App.4th at 420, 27 Cal.Rptr.2d at 470

10  (evidence that a supervisor had power to terminate and supervise employee's performance was

11  insufficient to establish managing agent).

12       The California Supreme Court has explained:

13           We therefore conclude that in amending section 3294, subdivision (b), the
14       Legislature intended that principal liability for punitive damages not depend on
         employees' managerial level, but on the extent to which they exercise substantial
15       discretionary authority over decisions that ultimately determine corporate policy.  Thus,
         supervisors who have broad discretionary powers and exercise substantial discretionary
16       authority in the corporation could be managing agents.  Conversely, supervisors who
         have no discretionary authority over decisions that ultimately determine corporate policy
17       would not be considered managing agents even though they may have the ability to hire
         or fire other employees.  In order to demonstrate that an employee is a true managing
18       agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would
         have to show that the employee exercised substantial discretionary authority over
19       significant aspects of a corporation's business.

20  *White*, 21 Cal.4th at 576-577, 88 Cal.Rptr.2d at 29.

21       A "supervisor must be in a corporate policymaking position in order to be considered a managing

22  agent for purposes of imposing punitive damages liability on the employer."  *Myers v. Trendwest*

23  *Resorts, Inc.*, 148 Cal.App.4th 1403, 1437, 56 Cal.Rptr.3d 501 (2007) (critical inquiry is the degree of

24  discretion the employees possess to make decisions that will ultimately determine corporate policy).

25       MSSB argues that supervisor Mr. Branch lacked "independent authority" over MSSB corporate

26  policies to impose punitive damages based on Mr. Branch's actions.  MSSB points to the absence of Mr.

27  Branch's responsibilities or level of autonomy to enable him "to make corporate policy of general

28  applicability."  MSSB notes Mr. Patterson's failure to identify other MSSB personnel engaging in

1  malicious or oppressive conduct and the lack of evidence that a managing agent approved, authorized

2  or ratified discriminatory conduct.

3         Without citing pertinent authority, Mr. Patterson responds that MSSB bears the burden to show

4  that Mr. Branch and MSSB regional manager Mr. Struckman were not managing agents.  Mr. Patterson

5  claims that MSSB lacks evidence that Mr. Branch and Mr. Struckman "lacked the requisite level of

6  authority and discretion."

7         MSSB is correct that Mr. Patterson merely states without evidence that Mr. Branch and Mr.

8  Struckman are managing agents.  Mr. Patterson offers nothing to suggest even remotely that Mr. Branch

9  and Mr. Struckman are managing agents, putting aside the lack of evidence that they engaged in

10  misconduct to support punitive damages.  Mr. Patterson's punitive damages claim fails with his age

11  discrimination claim.

12                              **<u>CONCLUSION AND ORDER</u>**

13         For the reasons discussed above, this Court:

14  1.       GRANTS MSSB summary judgment;

15  2.       DIRECTS the clerk to enter judgment in favor of defendant Morgan Stanley Smith

16           Barney, LLC and against plaintiff Clarence Reith Patterson, Jr. and to close this action;

17           and

18  3.       VACATES the April 3, 2012 pretrial conference and May 30, 2012 trial.

19         IT IS SO ORDERED.

20  **Dated:   February 23, 2012                    /s/ Lawrence J. O'Neill**
                                      UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28